**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-3123

SENDY MATA, individually and as next friend of M.E. and F.E., minors;
JOSE ELIZALDE, individually;
EVELYN ELIZALDE, individually,

      Plaintiffs,

v.

BRANDON SAUNDERS, Lakewood Police Officer, in his individual capacity; and
SPIRIT HALLOWEEN SUPERSTORES, LLC,

      Defendants.

---

## COMPLAINT & JURY DEMAND

Plaintiffs, by and through undersigned counsel, Olivia Kohrs of Novo Legal Group, LLC, hereby allege for their Complaint and Jury Demand as follows:

### I.  INTRODUCTION

1.      On October 16, 2019, what began as a fun family outing turned into a terrifying and humiliating experience for the entire Mata Family.

2.      That afternoon, Mrs. Sendy Mata ("Mrs. Mata") went to a Spirit Halloween store located in Lakewood, Colorado, with her daughter Evelyn Elizalde ("Ms. Elizalde"), seventeen years old at the time, her daughter's friend, her son M.E., fifteen years old at the time, and her son F.E., ten years old at the time, to shop for Halloween costumes.

3.      Over the course of the afternoon, the Mata Family, who is Hispanic, noticed Spirit Halloween employees following them around. This made them uncomfortable, but they brushed it

off and told themselves the employees were just working. Though they felt like they were being followed and watched, they didn't let that stop them from trying to enjoy the afternoon. They spent a few hours browsing the store and shopping for the perfect costumes—ultimately deciding on a pirate costume for Ms. Elizalde, a giant inflatable baby costume for M.E., and a Ghostbusters Stay Puft ghost costume for F.E. They paid for their costumes and then left the store.

4.      When they left, however, a Defendant Spirit Halloween employee followed them outside and, the Mata Family would soon find out, then called the Lakewood Police Department to baselessly accuse the Mata Family of stealing about $60 worth of merchandise from the store.

5.      After leaving the store, Mrs. Mata dropped her daughter off at home before dropping her friend off at her home a couple blocks away. With her two sons still in the car, Mrs. Mata then began to drive the three of them home.

6.      When she got closer to her house and pulled into her driveway, she saw a police car rapidly turn behind her and turn on its lights, blocking their car in.

7.      F.E. hadn't seen the police officer pull up and, still excited about their trip to Spirit Halloween and eager to try on his brand-new costume, jumped out of the car, clutching his costume.

8.      The police officer, Defendant Saunders, quickly got out of his car with his hand on his gun, ready to draw, and immediately began yelling at F.E. and then at Mrs. Mata and M.E. to get out of the car with their hands up and get on the ground.

9.      Mrs. Mata and her sons were stunned. They had no idea what was going on, and frantically tried to follow the officer's orders to avoid Defendant Saunders shooting them or otherwise escalating the situation.

10.     Once they were on the ground, Defendant Saunders told Mrs. Mata that they were suspected of shoplifting. The officer opened and searched the vehicle and bags, but didn't find anything that wasn't on the receipts, while Mrs. Mata, M.E., and F.E. kneeled, terrified, confused, and embarrassed on the ground in front of their home.

11.     After Defendant Saunders finished searching the Mata Family, he nervously laughed and apologized for how he approached Mrs. Mata and her sons. He told them that that was just how police officers handle those situations.

12.     Defendant Saunders then joked about how scared the youngest child, F.E., was when he jumped out of his car and yelled at the child to get down on the ground. He laughed and said mockingly that Mrs. Mata and M.E. should have seen the face of F.E. because he looked so terrified.

13.     Despite Mrs. Mata, M.E., and F.E. telling Defendant Saunders that they hadn't stolen anything, and having the receipts to prove it, this wouldn't be the end of what had begun as a fun afternoon but had turned into quite the opposite.

14.     Though Mr. Jose Elizalde, Mrs. Mata's husband and the father of Ms. Elizalde, M.E., and F.E., had not been shopping with his family that afternoon, Defendant Saunders went to his workplace to question him in front of his boss and his coworkers. Mr. Elizalde informed the officer that he had been at work since 9:30 that morning. Again, Defendant Saunders joked, this time to F.E.'s father, about how scared F.E. looked.

15.     Later that evening, two other officers returned with Defendant Saunders to Mrs. Mata's home to serve trespass notices on her and her son, M.E., barring them from returning to

the Spirit Halloween location for a year. He joked, for at least the third time, about how scared F.E. had been.

16.     A few days later, Spirit Halloween contacted Mrs. Mata to apologize for how their store employee had treated her and her family that day and offered to rescind the trespass notices, refund their purchase, and have the company send a written apology. That apology never came.

17.     The Mata Family brings this lawsuit as a result of the serious injuries, damages, and losses they sustained as a result of the actions and inactions of Defendants Brandon Saunders and Spirit Halloween Superstores.

## II.  JURISDICTION AND VENUE

18.     This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331. This action is brought under 42 U.S.C. § 1983 and 42 U.S.C. § 1981. Jurisdiction supporting Plaintiffs' claims for attorney fees is conferred by and brought pursuant to 42 U.S.C. § 1988. This Court has jurisdiction over Plaintiffs' state law claims against Defendant Saunders pursuant to 28 U.S.C. § 1367, and over Plaintiffs' state law claim against Defendant Spirit Halloween pursuant to 28 U.S.C. § 1331. Plaintiffs were residents of and domiciled in Colorado at all times relevant to the subject matter of this litigation. Defendant Spirit Halloween is a corporation headquartered in New Jersey and incorporated in Delaware. The amount in controversy exceeds $75,000.

19.     Venue is proper in this District under 28 U.S.C. § 1391(b). The events and omissions giving rise to the claims asserted in this action occurred within the District of Colorado.

20.     Pursuant to the Colorado Governmental Immunity Act, §§ 24-10-101, *et seq.*, Plaintiffs sent a Notice of Claim to the City of Lakewood City Attorney's Office and the Lakewood Police Department on April 14, 2020.

## III. PARTIES

**Plaintiffs**

21.     At all times relevant to the subject matter of this litigation, Plaintiff Sendy Mata was a resident of and domiciled in the State of Colorado.

22.     Plaintiff Jose Elizalde is Mrs. Mata's husband. At all times relevant to the subject matter of this litigation he was a resident of and domiciled in the State of Colorado.

23.     Plaintiff Evelyn Elizalde is the daughter of Mrs. Mata and Mr. Elizalde. At all times relevant to the subject matter of this litigation she was a resident of and domiciled in the State of Colorado.

24.     Plaintiff M.E. brings this action by and through their parent and legal guardian, Sendy Mata. M.E. is a minor child of Mrs. Mata and Mr. Elizalde. At all times relevant to the subject matter of this litigation M.E. was a resident of and domiciled in the State of Colorado.

25.     Plaintiff F.E. brings this action by and through their parent and legal guardian, Sendy Mata. F.E. is a minor child of Mrs. Mata and Mr. Elizalde. At all times relevant to the subject matter of this litigation F.E. was a resident of and domiciled in the State of Colorado.

**Defendants**

26.     At all times relevant to the subject matter of this litigation, Defendant Brandon Saunders was employed by the City of Lakewood, Colorado, as a police officer, and acting under color of state law. He is herein identified in his individual capacity.

27. Defendant Spirit Halloween Superstores, LLC ("Spirit Halloween") is a subsidiary of Spencer Spirit Holdings, Inc. Spirit Halloween's headquarters are located at 6826 Black Horse Pike, Egg Harbor Township, NJ 08234. Spirit Halloween is incorporated in Delaware. Defendant Spirit Halloween's registered agent of service in Colorado is C T Corporation System, 7700 E. Arapahoe Rd. Ste. 220, Centennial, CO 80112.

28. Defendant Spirit Halloween is a private corporation, and thus is not entitled to any immunity under the Colorado Governmental Immunity Act on Colorado state law claims or qualified or any other immunity on federal law claims.

## IV. STATEMENT OF FACTS

*The Mata Family's Afternoon Shopping for Halloween Costumes at Spirit Halloween*

29. On October 16, 2019, with Halloween quickly approaching, Mrs. Mata and her three children decided to meet that afternoon at Spirit Halloween in Lakewood, Colorado, to go shopping for Halloween costumes.

30. They didn't usually get to spend much money on Halloween costumes from stores like Spirit Halloween. This year, however, was special.

31. Ms. Evelyn Elizalde, Mrs. Mata's seventeen year old daughter, had begun to work and offered to use her paycheck to help pay for her and her brothers' costumes that year—she wanted her brothers to be able to pick out any costume they liked.

32. Mrs. Mata, Ms. Elizalde, Ms. Elizalde's friend, and Mrs. Mata's ten year old son, F.E., headed to Spirit Halloween around 2:50 pm that afternoon to start shopping for their costumes.

33.     Around 3:30 pm, Mrs. Mata's fifteen year old son, M.E., joined them when he was let out of school for the day.

34.     They took their time browsing, taking pictures together, and enjoying the afternoon, while trying to find the perfect costumes.

35.     After about two hours they had found their perfect costumes—for Halloween that year Ms. Elizalde would dress as a pirate, M.E. would dress as a giant inflatable baby, and F.E. would dress as the Ghostbusters Stay Puft ghost.



36.     The store was offering a discount, so once they all found their costumes, they payed separately to take advantage of the discount and then left the store together around 4:45 pm.

***Spirit Halloween's Targeted Discrimination and Baseless Accusation of Shoplifting***

37.     The Mata Family, who is Hispanic, were speaking to each other in a combination of English and Spanish while they shopped, and, upon information and belief, were one of the only, if not *the* only, family of color in the store at that time.

38.    Over the course of the afternoon, the Mata Family noticed Spirit Halloween employees following them around. This made them uncomfortable, but they brushed it off and told themselves the employees were just working.

39.    Still, they could feel the employees looking at them with a suspicious look on their faces like they thought the Mata Family was "up to something." They felt like there was an employee watching them every time they turned around.

40.    Mrs. Mata was so aware of the eyes on her and felt so uncomfortable that when she paid for F.E.'s costume first, she asked a store employee if she could leave that purchased costume at the front counter while they continued to shop for Ms. Elizalde and M.E.'s costumes to avoid any confusion about whether she had purchased the costume already or not.

41.    As they were finishing checking out and paying for their costumes, a young, white, Spirit Halloween employee stated that she was going to go smoke a cigarette. Upon information and belief, this was the store's assistant manager.

42.    When the Mata Family walked out of store that same employee followed them outside, into the parking lot, and watched them get into their car.

43.    Unbeknownst to the Mata Family, that employee wrote down their license plate number and called the police to report that a "family of five" had stolen approximately $60 worth of merchandise before leaving the store. She did not allege any violent behavior or threats on the part of any person she was reporting.

44.    The employee reported that there were cameras in the store but that only the manager, who was not there, could access them.

45.     Defendant Saunders, a police officer with the City of Lakewood Police Department, responded to this call, ran the license plate number, and found that it belonged to the Mata Family. He then drove to the Mata home, knowing that 1) he was responding to shoplifting allegations for $60 worth of merchandise; 2) that the report indicated that a "family" was suspected, so there would likely be children present; and 3) that there was no indication or allegation of any violent behavior.

***Defendant Saunders' Disproportional and Unreasonable Response to the Baseless Allegations Against the Mata Family***

46.     Because the Mata Family had spent more time finding costumes than they had originally planned, Mrs. Mata first dropped Ms. Elizalde off at their home to begin getting ready for her shift at work at 5:00 pm that afternoon before dropping Ms. Elizalde's friend off at her house a few blocks away. She then began driving back home with her sons M.E. and F.E. in the car.

47.     When she neared their home, she noticed a police car, but didn't think much of it until she pulled into her driveway and she saw the police car in her rear-view mirror quickly turn around behind her, flipping on its lights and blocking her car in her driveway.

48.     Before she could register what was going on, her son, F.E., still excited about the afternoon and eager to try on his new costume, opened the car door and jumped out, clutching his costume.

49.     In that same instant, Defendant Saunders saw the Spirit Halloween bag in F.E.'s hand and got out of his car with his hand on his gun. He immediately began yelling at F.E. to get down on the ground, with his hand ready to draw his gun, despite the fact that F.E. was just a child and there was not threat or risk of violence.

50.     F.E. remembers seeing Defendant Saunders point his gun at him as he yelled.

51.     F.E. was scared to death that Defendant Saunders was going to hurt him, his mom, or his brother, but he was too scared to even cry.

52.     Defendant Saunders kept his hand on his gun and continued yelling at the family to get out of the car with their hands up and to get on the ground.

53.     Mrs. Mata and M.E. both got out of the car. Defendant Saunders made F.E. walk around the car to join his mother and brother as he yelled for them to all kneel down in the lawn.

54.     The first thing Mrs. Mata saw Defendant Saunders do was reach for his gun. Mrs. Mata's eyes never left that gun; she felt certain Defendant Saunders was about to shoot her or one of her sons.

55.     Mrs. Mata and her sons were terrified. Mrs. Mata could see F.E.'s face and he had tears in his eyes as Defendant Saunders made him get onto the ground in their front yard, still clutching his costume. She felt hopeless—all she wanted to do was comfort her sons, but she couldn't move. She could see F.E.'s face but she couldn't reach out to him to hug him or hold him

56.     M.E. was scared but he didn't want his brother to worry, so he tried to put on a brave face to hide his fear.

57.     Mrs. Mata felt like Defendant Saunders had them on the ground like they were criminals. She felt like all her neighbors were looking at them; some even came over to see what was going on. She felt confused, humiliated, and terrified.

58.     M.E. also saw the neighbors watching them. He felt embarrassed because Defendant Saunders was treating him and his family like criminals even though they had not done

anything wrong. He felt like the neighbors were judging him and his family for something that they had not done.

59.     It wasn't until they were all on the ground that Defendant Saunders told Mrs. Mata that they were suspected of shoplifting and that there was surveillance footage of them doing so.

60.     M.E. told Defendant Saunders that they had not stolen anything and that they had receipts for everything, and Mrs. Mata told the officer that no one else was in the vehicle—it was just her and her two sons.

61.     Defendant Saunders opened and searched the vehicle, costume bags, and M.E.'s backpack—not finding anything that wasn't on the receipts—while Mrs. Mata and her two sons continued to kneel on the ground in front of their home.

62.     Mrs. Mata again reiterated that they had not stolen anything, and asked to see the surveillance footage. Defendant Saunders, who hadn't seen the footage himself, told Mrs. Mata that the footage was unavailable and that an investigator would have to look at the footage first before she could see it.

63.     During this time, Ms. Elizalde had been inside the house getting ready for work and had no idea what was going on in her front yard. At the time, she worked at a restaurant with her father that was close enough to her home that she could not only walk to work, but that could be seen from her home.

64.     She walked out of the house to walk to work and saw Defendant Saunders searching her mother and brothers.

65.      Mrs. Mata told her to go inside and get her costume. Defendant Saunders confirmed her costume against the receipts as well.

66.     While this was happening, Mr. Elizalde had been at work at the restaurant across the street. As the time for Ms. Elizalde's shift there got closer, he went outside to look over towards their home to see where she was.

67.     From the restaurant he saw a terrifying scene—a police car stopped in front of his home.

68.     He began calling Mrs. Mata, but she didn't answer. He had no idea what was going on and couldn't get ahold of his wife.

69.     Ms. Elizalde, after showing her costume to Defendant Saunders, walked to work. She was late for her shift.

70.     After Defendant Saunders finished searching the Mata Family's car and comparing the receipts to the costumes, he nervously laughed and apologized for how he approached Mrs. Mata and her sons.

71.     He told them that that was just how police officers handle those kinds of situations.

72.     Defendant Saunders then joked about how scared F.E. was when he jumped out of his car and yelled at the child to get out of the car with his hands up and to get onto the ground. He laughed and said mockingly that Mrs. Mata and M.E. should have seen the face of "this little guy," F.E., because he looked so terrified.

73.     Despite Mrs. Mata, M.E., and F.E. telling Defendant Saunders that they hadn't stolen anything, and having the receipts to prove it, this wouldn't be the end of what had begun as a fun afternoon, but had turned into quite the opposite.

74.      Though Mr. Elizalde had not been shopping with his family that afternoon, Defendant Saunders went to his workplace, the restaurant across the street, to question him in front

of his boss and coworkers. Mr. Elizalde informed the officer that he had been at work since 9:30 that morning and had not gone shopping with his family that afternoon.

75.     He was embarrassed to be questioned by the police for shoplifting at his place of work. He didn't know how to explain the situation to his boss or coworkers because he had no idea what was going on.

76.     Again, Defendant Saunders joked, this time to F.E.'s father, about how scared F.E. looked.

77.     While at the restaurant questioning Mr. Elizalde, Defendant Saunders questioned Ms. Elizalde again, at her place of work, about the alleged shoplifting.

78.     Defendant Saunders then, also, went to the home of Ms. Elizalde's friend to question her as well. She told Defendant Saunders what the Mata Family had already told him—that they had not stolen anything, and that the only people shopping that day had been her, Mrs. Mata, Ms. Elizalde, M.E., and F.E.

***The Spirit Halloween Report to the Police***

79.     When the Spirit Halloween employee called the Lakewood Police Department, she told the dispatcher that a "family of five" had been shoplifting and had stolen approximately $60 worth of merchandise. She did not allege any violent behavior or threats on the part of anyone in that "family of five."

80.     Shortly after Defendant Saunders went to the Mata Family home, two other officers responded to the Spirit Halloween store to speak with the employee who had called.

81.     The employee reported, at that time, that she thought a family of six, not five, people had stolen merchandise. She described a bald Hispanic male father wearing a gray t-shirt,

a Hispanic female mother wearing a gray t-shirt and jeans, two teenage kids, one ten-year-old kid, and one "adult kid" over 18-years-old.

82.     The employee told the police officer that the family had entered the store around 3:30 pm and that the family had bought some items and then left them in the front of the store so that the store staff could hold onto them while they continued shopping before finishing their purchases and leaving the store around 4:40 pm.

83.     The employee said that she saw the father concealing store items under his shirt, and that she saw the mother drop a costume, and the employee believed that when she dropped it she had somehow concealed the costume in her pants, before dropping the then-empty package on the ground.

84.     The employee then estimated that the family concealed three costumes and accessories that totaled $140 in merchandise.

85.     The officer asked the employee if he could see the video surveillance footage, but the employee told him that the cameras could only be accessed by the store manager who wouldn't be back until October 27.

86.     Not only did her report differ from her initial report, but it did not match the Mata family. Not only was Mr. Elizalde never present at the Spirit Halloween store, but when Defendant Saunders arrived at the Mata house, the Mata Family's clothing did not match the report either.

87.     Upon information and belief, later, long after the police left, Spirit Halloween employees reviewed the surveillance footage and found that two older, white people had actually been shoplifting that day, not the Mata Family.

88.     The Spirit Halloween employee told the officers that she wanted the police to issue trespass notices against the "father, mother, and oldest son.

***The Spirit Halloween Trespass Notices Against Mrs. Mata and M.E.***

89.     Later that evening, after speaking with the Spirit Halloween employee, two other officers returned with Defendant Saunders to Mrs. Mata's home.

90.     Since Mr. Elizalde had not been there that day, they came to serve the seemingly arbitrary trespass notices on just Mrs. Mata and her son, M.E., but not on any of the rest of the family.

91.     These notices barred them from entering the Spirit Halloween location for a year, despite the fact that they had not stolen anything and there was no evidence to support Spirit Halloween's baseless accusations.

92.     Mrs. Mata was still in shock about how Defendant Saunders had treated her and her family earlier that day.

93.     Mrs. Mata had a neighbor over at the time the police came back. Again, for what was at least the third time, Defendant Saunders joked to the neighbor, in front of the other officers, about how scared F.E. had been earlier that day.

***Spirit Halloween's Response***

94.     Upon information and belief, this isn't the first time that Spirit Halloween has falsely accused someone of shoplifting, called the police on a customer, or reflexively issued a trespass notice to someone, because of their race and Spirit Halloween's discriminatory practices.

95.     Upon information and belief, in 2016, Spirit Halloween employees in Texas called the police on a non-white male attempting to return light bulbs to the store. Upon information and

belief, when the man exited the store, six police officers were waiting for him and issued him a trespass notice, barring him from the premises. Upon information and belief, the trespass notice was groundless and the result of suspected racial profiling.

96.     Upon information and belief, on October 18, 2019, just two days after the Mata Family were falsely accused of shoplifting and had the police called on them, a nineteen-year-old Black teenager in Washington was also falsely accused of shoplifting. Upon information and belief, the teenager left the store after she was accused and called the police herself to report the accusation. When the police arrived, upon information and belief, the store, again, claimed to have video footage demonstrating the alleged theft but refused to show the video to the police or to the accused teenager. Instead, upon information and belief, the store employees had the police issue the teenager with a trespass notice, also barring her from the premises for a year.

97.     Mrs. Mata was shocked by the way that her family had been treated by Spirit Halloween and contacted Spirit Halloween the next day.

98.     She wanted to talk to someone about what policies or procedures Spirit Halloween employees were supposed to follow in situations like that.

99.     She left a message and received a call back later that day from the Spirit Halloween Claims and Risk Manager who told Mrs. Mata that she would get in touch with the Spirit Halloween General Counsel, and they would call Mrs. Mata back together.

100.    The next day, on or about October 18, 2019, the Claims and Risk Manager and General Counsel called Mrs. Mata to apologize for how their store employee had treated Mrs. Mata and her family.

101.    They let Mrs. Mata know that they had addressed the issue with the employees involved, one of whom was no longer with their business.

102.    They also offered to refund their transaction, and told Mrs. Mata that they would contact the Lakewood Police Department to rescind the trespass notices. Upon information and belief those noticed have since been rescinded. Additionally, they offered an apology letter on behalf of the company, but that apology never came. She has not heard from Spirit Halloween since.

***The Aftermath and Lingering Effect of Spirit Halloween's Discriminatory Accusations and Defendant Saunders' Response***

103.    Following the event, the family felt discriminated against, confused, angry, disrespected, and humiliated.

104.    Mrs. Mata was so upset that she didn't go back to work at her food truck for four days following this incident.

105.    The children didn't want to go back to school the day after the incident, but Mrs. Mata insisted. The kids returned upset about what had happened the day before.

106.    Ms. Elizalde and M.E. have a good relationship with the school resource officer at Alameda High School, where they attended.

107.    The children trusted him, so they spoke to him about what had happened when they returned to school.

108.    The resource officer could tell just how upset the children were when he spoke to them, and he reached out to Mrs. Mata to offer to call the Lakewood Police Department himself and help Mrs. Mata begin an Internal Affairs investigation into Defendant Saunders.

109.    On October 18, 2019, just two days after the incident, the Lakewood Police Department called Mrs. Mata and notified her that it had received her allegations of misconduct against the Lakewood Police Department and one or more of its employees, and that it would be conducting an internal investigation into the events that transpired on October 16, 2019.

110.    Mrs. Mata told the investigator that Defendant Saunders's behavior was inappropriate. Mrs. Mata reported to the investigator that she was upset about Defendant Saunders laughing repeatedly at how he had terrified her ten-year-old son, F.E. She reported that Defendant Saunders had made fun of the boy's fear several times—to her, to her husband at his work, and even to the two other officers that later came to her house to serve her and her son with trespass notices.

111.    Following this internal affairs investigation, Defendant Saunders, upon information and belief, receiving counseling and training.

112.    A year later, the Mata Family is still healing from the trauma of that day.

113.    Halloween was once a holiday the family all looked forward to, but Spirit Halloween has, in Ms. Elizalde's own words, killed the spirit of Halloween.

114.    Mrs. Mata still struggles with the best way to explain to her children that they were profiled in a store because of the color of their skin.

115.    Mrs. Mata spent the days after the encounter crying a lot. She felt scared and worried about how frightened her children were and wondered why she hadn't done anything more when Defendant Saunders showed up. She felt helpless.

116.    Ms. Elizalde is worried that the incident was her fault because she took her time finding the perfect Halloween costume, and regularly thinks back on that day to think about what they could have done differently to avoid this happening.

117.    She was so excited for Halloween and remembers the smiles on her brothers' faces as they all got ready to shop for their costumes.

118.    She is furious every time she thinks about Defendant Saunders coming to their home and making fun of F.E. for being afraid for his life. She now feels disappointed in and suspicious of the law enforcement officers that she had believed were supposed to protect her and her family.

119.    M.E. was worried that having a trespass notice on his record would reflect poorly on him and make it difficult for him to get into college.

120.    He felt depressed, defensive, and all-around discouraged from engaging in anything that he used to enjoy. He didn't understand why the Spirit Halloween employees thought that they had stolen something, other than because of the color of his and his family's skin.

121.    To this day, M.E. feels like there are eyes watching him everywhere he goes.

122.    F.E. is still processing how that day made him feel.

123.    F.E. has lost much of his confidence, and doesn't like to do the things he used to like doing—like going outside or riding his bike.

124.    He avoids going into stores now when he can. This year he wants to order his costume online, so he doesn't have to go into a Halloween store.

125.    He vividly remembers Defendant Saunders laughing at him and making fun of how scared he was. He felt bullied by the officer.

126.     None of the kids on F.E.'s block will play with him anymore. He thinks this is because they saw the police at his house and now think that F.E. is a bad person.

127.     F.E. is scared and gets flashbacks every time he sees a police car or a police officer and doesn't know if they are good or bad police officers.

128.     The Mata Family expected that their trip to Spirit Halloween would make for a fun and memorable afternoon and a fun and memorable Halloween. What they were left with instead was discrimination, fear for their lives, distrust of the police officers that they believed were supposed to protect them, and emotional and psychological wounds that they are still working hard to try to heal.

## V.  STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 Fourth Amendment Violation – Unreasonable Seizure
### By Plaintiff Sendy Mata, Plaintiff M.E., and Plaintiff F.E. Against Defendant Saunders

129.     Plaintiffs hereby incorporates all of the paragraphs of this Complaint as though fully set forth herein.

130.     At all times relevant to the subject matter of this litigation, Defendant Saunders was acting under the color of state law in his capacity as a Lakewood law enforcement officer.

131.     The actions as described herein of Defendant Saunders deprived Plaintiffs of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including the right to freedom from unreasonable seizures as guaranteed by the Fourth Amendment to the Constitution of the United States of America, made actionable pursuant to 42 U.S.C. § 1983.

132.    Defendant Saunders unreasonably seized Plaintiffs Sendy Mata, M.E., and F.E., by forcing them out of their vehicle with the threat of his gun and forcing them onto their knees in front of their home for approximately 10 minutes.

133.    During this time, Plaintiffs were confined by the Defendant within a limited space and were not permitted to leave.

134.    At the time Defendant Saunders unreasonably seized Plaintiffs, the only crime that a "family of five" who was seen getting into a car registered to the Mata Family was suspected of committing was misdemeanor theft—the theft of $60 worth of merchandise from a Halloween costume store.

135.    Defendant Saunders failed to reasonably interview witnesses readily available at the scene, investigate basic evidence, view the surveillance footage alleged to exist, or otherwise inquire if a crime had been committed at all before invoking the power of the warrantless detention of Plaintiffs.

136.    This suspected "family of five" was not suspected of violence or threat, and posed no threat to any law enforcement officer. When Defendant Saunders arrived on the scene and stopped three people—Mrs. Mata, M.E., and F.E.—not a family of five, no one attempted to evade or resist him, nor did they exhibit any threatening behavior.

137.    Under these circumstances, Defendant Saunders unreasonably utilized his gun to effectuate an embarrassing and traumatic detention.

138.    Defendant Saunders' acts or omissions were the proximate cause of Plaintiffs' injuries, including loss of liberty, mental and emotional harm, and dignitary injuries.

## SECOND CLAIM FOR RELIEF
### Assault
### By Plaintiff F.E. Against Defendant Saunders

139.    Plaintiffs hereby incorporates all of the paragraphs of this Complaint as though fully set forth herein.

140.    Defendant Saunders intended to cause an offensive or harmful physical contact with Plaintiff F.E., or intended to place the Plaintiff F.E. in apprehension of such contact when he exited his police vehicle yelling at F.E. to get on the ground with his hand on his gun.

141.    Defendant Saunders placed Plaintiff F.E. in apprehension of immediate physical contact which appeared to be harmful and offensive. Plaintiff F.E. remembers Defendant Saunders pointing his gun at him, and believed that Defendant Saunders was about to kill him.

142.    As a result of Defendant Saunders' actions, Plaintiff F.E. suffered significant and ongoing emotional distress, embarrassment, and lasting and potentially permanent psychological and emotional injury.

## THIRD CLAIM FOR RELIEF
### Extreme and Outrageous Conduct - Intentional Infliction of Emotional Distress
### By Plaintiff F.E. Against Defendant Saunders

143.    Plaintiffs hereby incorporates all of the paragraphs of this Complaint as though fully set forth herein.

144.    As described in the various paragraphs of this Complaint, Defendant Saunders, who knew, based on the report he received, that he was attempting to stop a family, engaged in extreme and outrageous conduct when he confronted F.E., a child, clutching a Halloween costume, with his hand on his weapon and ready to draw, without reason or justification. F.E. remembers Defendant Saunders pointing his gun at him.

145.    Of particular outrage, Defendant Saunders further perpetuated and compounded this injury against F.E., then just ten years old, by continuing to relish in the horror he caused the young boy by laughing at him and making fun of how scared he looked first to Mrs. Mata, his mother, then laughing again later at the boy and commenting on how terrified he was to Mr. Elizalde, his father, and finally, laughing and making fun of him for being scared to his neighbor and in front of other police officers.

146.    Defendant Saunders' actions set forth above were rooted in an abuse of power or authority.

147.    Defendant's conduct evinces a shocking disregard for the rights and feelings of F.E. and was undertaken with intent or knowledge that there was a high probability that the conduct would inflict severe emotional distress and with reckless disregard of that probability.

148.     Defendant's actions set forth above were undertaken with malice, willfulness, and reckless indifference to the rights of others and caused Plaintiff F.E. significant and ongoing emotional distress, embarrassment, and lasting and potentially permanent psychological and emotional injury.

149.    Defendant's act constitutes the tort of extreme and outrageous conduct—intentional infliction of emotional distress.

150.    As a direct and proximate result of Defendant's conduct, Plaintiff F.E. has suffered the damages and injuries set forth herein.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1981**
**By Plaintiff Sendy Mata, Plaintiff Evelyn Elizalde, Plaintiff M.E., and Plaintiff F.E.**
**Against Defendant Spirit Halloween**

151.    Plaintiffs hereby incorporates all of the paragraphs of this Complaint as though fully set forth herein.

152.    Plaintiffs are members of a class protected by Section 1981. The Mata Family is Hispanic.

153.    Defendant Spirit Halloween intentionally discriminated against Plaintiffs on the basis of race or citizenship by targeting them inside the store and following the family while they shopped. Defendant Spirit Halloween further intentionally discriminated against Plaintiffs when it called the police to issue trespass notices on the Plaintiffs because of an unsubstantiated accusation of shoplifting, despite a lack of evidence, and without verifying, or allowing the police to verify, the store's baseless suspicion on the store's video surveillance system.

154.    This discrimination interfered with a protected activity as defined in Section 1981—Plaintiffs were denied the right to make, enforce, and enjoy contracts on the same basis as white citizens.

**FIFTH CLAIM FOR RELIEF**
**Extreme and Outrageous Conduct - Intentional Infliction of Emotional Distress**
**By Plaintiff Sendy Mata, Plaintiff Jose Elizalde, Plaintiff Evelyn Elizalde, Plaintiff**
**M.E., and Plaintiff F.E. Against Defendant Spirit Halloween**

155.    Plaintiffs hereby incorporates all of the paragraphs of this Complaint as though fully set forth herein.

156.    Without reason or justification, Defendant Spirit Halloween, vicariously liable for the actions of its employees, engaged in extreme and outrageous conduct when it racially profiled,

then intentionally, falsely, and unlawfully accused Plaintiffs of committing a crime when it had no credible evidence for such accusations, but instead had easy and ready access to information showing that they had not engaged in any unlawful act.

157.    Defendant further perpetuated its extreme and outrageous conduct when it escalated its false accusations even further by calling the police, and then refused to show the purposed video footage to law enforcement officers, resulting in the subsequent traumatic stop by the police, and the issuance of two trespass notices.

158.    Defendant's conduct evinces a shocking disregard for the rights and feelings of Plaintiffs, and was undertaken with intent or knowledge that there was a high probability that the conduct would inflict severe emotional distress and with reckless disregard of that probability.

159.    Defendant's actions set forth above were undertaken with malice, willfulness, and reckless indifference to the rights of others and caused Plaintiffs significant and ongoing emotional distress, embarrassment, and lasting and potentially permanent psychological and emotional injury.

160.    Defendant's act constitutes the tort of extreme and outrageous conduct—intentional infliction of emotional distress.

161.    As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered the damages and injuries set forth herein.

## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request respectfully that this Court enter judgment in their favor and against Defendants, and award them all relief as allowed by law and equity, including, but not limited to the following:

a. Compensatory damages, including but not limited to those for emotional distress and pain and suffering;

b. Actual economic damages and consequential damages arising out of Defendants' conduct as established at trial;

c. Punitive damages for claims as allowed by law and in an amount to be determined at trial;

d. Pre-judgment and post-judgment interest at the highest lawful rate;

e. Attorneys fees and costs; and

f. Such further relief as justice requires.

**Plaintiffs request a trial to a jury on all issues so triable.**

DATED this 16 day of October, 2020.

Respectfully submitted,

*s/ Olivia Kohrs*
Olivia Kohrs
Novo Legal Group, LLC
4280 Morrison Rd.
Denver, CO 80219
T: 303-335-0250
F: 303-296-4586
E: olivia@novo-legal.com